# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHEN RUDER** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PEQUEA VALLEY SCHOOL** | : | **10-442** |
| **DISTRICT, et al.** | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                                                    **May 12,  2011**

## MEMORANDUM OPINION

This lawsuit arose after Plaintiff, Stephen Ruder, was terminated from his employment with

Pequea Valley School District (Pequea Valley).  Ruder has filed suit against his former employer,

Pequea Valley, his former medical provider, Regional Gastroenterology Associates of Lancaster

(RGAL), and numerous individuals.  Ruder's ten count amended complaint alleges civil rights

violations pursuant to 28 U.S.C. § 1983 (Count I); violations of the Americans with Disabilities Act

(ADA) (Count II); violations of the Family Medical Leave Act (FMLA) (Count III); violations of

the Pennsylvania Human Relations Act (Count IV); interference with contractual relations (Count

V); intentional infliction of emotional distress (Count VI) ; negligence (Count VII); defamation

(Count VIII); invasion of privacy (Count IX); and civil conspiracy (Count X).

Presently before the Court are the motions to dismiss of the Pequea Valley School District

Defendants' (PVSD Defendants)[1] and the Regional Gastroenterology Defendants' (RGAL

---

[1]  The Pequea Valley School District Defendants include Pequea Valley School District as well as individual Defendants Jason Marin, Principal at Pequea Valley High School; Patrick Hallock, Superintendent of Pequea Valley; John Bowden, Business Administrator for Pequea Valley; Pequea Valley School Board; and School Board Members Bryant Ferris, Christian Blackbill, Jr., Charles H. Rohrer, Norman J. Hershey, Fred H. Hertzler, Virginia L. Ranck, Michael Sage, Deb Sensenig, and Vernon D. Wright (collectively the "PVSD Defendants").

Defendants).[2]  Upon consideration of the respective briefs and for the reasons expressed below, Defendants' motions will be granted in part and denied in part.

## I. BACKGROUND

Based upon the averments in the amended complaint, the pertinent facts, viewed in the light most favorable to Ruder, are as follows:

Stephen Ruder was hired by Pequea Valley in 2000, became the art teacher at Pequea Valley High School in 2002 and was thereafter promoted to the Chair of the Art Department for Pequea Valley in 2005.   Ruder was employed pursuant to employment contracts corresponding to each academic year.  (Am. Compl. ¶¶ 6, 24-26.)

In March 2004, Ruder was diagnosed with Crohn's disease, an autoimmune disorder which causes extreme abdominal pains, diarrhea and fevers, and is associated with internal infections and abscesses that form in the pelvic cavity.  Chron's is exacerbated by stress and can occur through "relapsing remitting" episodes that are unpredictable.   The disease is a chronic condition that requires life-long medical management, medication and hospitalizations.  (Am. Compl. ¶¶ 27-28.)

Ruder informed Pequea Valley that he was diagnosed with Crohn's disease in March 2004. While he was able to continue to perform his essential job duties, Ruder alleges that he made numerous requests for accommodations that were ignored.   (Am. Compl. ¶¶ 29-31.)

Defendant Jason Marin became the principal of Pequea Valley High School, and Ruder's immediate supervisor, in 2007.  (Am. Compl. ¶¶ 33-35.)  Ruder alleges that Marin maintained a "surveillance record" of him because his Crohn's disease required intermittent leave from work.  On

---

[2] The Regional Gastroenterology Associates of Lancaster Defendants include Regional Gastroenterology Associates of Lancaster (RGAL); Marcia Gephart; and Edward Rish (collectively the "RGAL Defendants").

October 31, 2008, Marin issued a three day suspension to Ruder for attending a medical appointment on October 6, 2008. Marin informed Ruder that in the future he had to personally inform him or the assistant principal when he expected to be late or leave work early. According to Ruder, this directive was not placed in writing, was more stringent than published school policy, and only applied to him. Thereafter, Ruder followed this directive and there were no attendance issues through February 5, 2009. (Am. Compl. ¶¶ 36, 38-40.)

Ruder also contends that he was treated "differently and disparately" because of his disability in that Marin disciplined him "for counseling a student and exercising his rights of free speech by membership in a comedy website that was unrelated to school and outside work hours." Ruder points out that Defendant John Bowden, Pequea Valley's Business Administrator, maintained a Facebook account with his picture taken in a public bar and Marin maintained a Facebook account through which he communicated with students. (Am. Compl. ¶ 37.) Ruder alleges this disparate treatment violated his First Amendment rights.

On February 2 and 3, 2009, Ruder notified Marin, Bowden, and Defendant Patrick Hallock, the Superintendent of Pequea Valley, that his Crohn's condition had deteriorated and that he was to be hospitalized. Ruder requested information regarding medical leave from work, but contends that Defendant employers failed to respond. (Am. Compl. ¶ 40.)

According to Ruder, because he had received no response about his need for hospitalization, on February 5, 2009, he attempted to travel to work. While en route, he had a severe flare up that caused him to stop at the nearest lavatory for relief and care. Ruder avers that his Crohn's caused him severe pain and disorientation and that he had attempted to call Marin or the assistant principal, as required by Marin, but inadvertently pressed the wrong button on his phone which mistakenly

connected him to the library. Ruder claims he left school almost immediately after arriving and was admitted to Hershey Medical Center. (Am. Compl. ¶ 40.)

Ruder returned to work on February 11, 2009. He notified Defendant employers that he remained ill but had returned because he did not receive any response regarding his outstanding requests for medical leave information and authorization. On that same day, and in response to Ruder's notice, Defendant Hallock paid Ruder for the day, sent him home, and directed that he not return until he presented a "medical release" to return to work. (Am. Compl. ¶¶ 42-43.)

On March 18, 2009, Ruder phoned RGAL, where he had been treated for his Crohn's disease, and requested a medical statement to return to work. On March 19, 2009, Ruder returned to work and placed the medical statement he had received in Defendant Marin's mailbox. Thereafter, Defendant Bowden contacted RGAL about the statement and spoke to Defendant Marcia Gephart, the RGAL Health Information Manager, who, according to Ruder, "published falsehoods that the medical statement was not authentic and accused [him] of forging the medical statement." Ruder also alleges that the RGAL Defendants admitted to deficient record keeping "including omitted 'overlooked' medical statements and failure to electronically record events." (Am. Compl. ¶¶ 44-46.)

On March 20, 2009, Ruder was placed on a ten-day suspension, and thereafter, on or about March 28, 2009, he was placed on indefinite suspension. On June 11, 2009, Defendant Pequea Valley School Board and named Defendant officers and voting members terminated Ruder's employment. (Am. Compl. ¶¶ 55-57.) According to Ruder, the PVSD Defendants "published" falsehoods and misstatements that wrongfully accused him of the following: intentionally violating the attendance policy on February 5, 2009; insubordination in failing to appear for a disciplinary

meeting on February 6, 2009, while knowing that Ruder was in Hershey Medical Center; failing to provide documentation of his disability to support leave from work; improperly taking cash from students, promising to purchase art supplies; taking $60.00 from a student and never buying the supplies; and forging the RGAL medical statement dated March 18, 2009. (Am. Compl. ¶ 58.) Ruder alleges that the statements were published to the faculty, staff, students and community at large without investigation as to the truthfulness of the statements. (Am. Compl. ¶¶ 61-63.)

## II. STANDARD OF REVIEW

Rule 12 of the Federal Rules of Civil Procedure enumerates various defenses and objections a party may raise in response to a pleading. See Fed. R. Civ. P. 12.

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. When ruling on a motion to dismiss under Rule 12(b)(6), a court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000). A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). However, "'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Iqbal, 129 S.Ct. at 1949). The complaint must state "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Wilkerson v. New Media Tech. Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) (quoting Bell Atlantic

<u>Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'" <u>Iqbal</u>, 129 S.Ct. at 1949.

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[M]otions to strike are disfavored and usually will be denied 'unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case.'" <u>Druffner v. O'Neill</u>, 2011 WL 1103647, at * 3 (E.D.Pa. March 24, 2011) (citing <u>Kim v. Baik</u>, 2007 WL 674715, at * 5 (D.N.J. Feb. 27, 2007) (quoting <u>River Road Dev. Corp. v. Carlson Corp.</u>, 1990 WL 69085, at * 2 (E.D.Pa. May 23, 1990))).

## III. ANALYSIS

The PVSD Defendants and the RGAL Defendants have filed separate motions to dismiss. The PVSD Defendants seek to dismiss Counts I, II, III, IV, V, VI and VIII under Fed. R. Civ. P 12(b)(6). The RGAL Defendants seek to strike Plaintiff's exhibits (and all references thereto) from the amended complaint pursuant to Fed. R. Civ. P. 12(f), and to dismiss Counts V, VI, VII, VIII, IX, and X (improperly labeled IX) under Fed. R. Civ. P. 12(b)(6).

### A. <u>Motion to Dismiss/Strike under Federal Rule of Civil Procedure 12(f)</u>

The RGAL Defendants first request that the Court "dismiss Plaintiff's amended complaint pursuant to Fed.R.Civ.P 12(f) for failure to conform to law or rule of court, and for the inclusion of scandalous and impertinent matter." The RGAL Defendants point out that Ruder has attached 50 pages of exhibits to the amended complaint "consisting mostly of emails and other documents that amount to hearsay" and urge that "[g]iven the nature of the impertinent and scandalous material that

Ruder seeks to place before this Honorable Court, Paragraphs 31, 36, 37, 41, 44, 46, 53, 54, 57, and 74, and Exhibits A through O should be stricken from the Amended Complaint with prejudice." (RGAL Defs.' Mot. ¶¶ 12-32.)[3]

I find that Ruder's exhibits are related to the controversy before us. Further, I do not find them to include any matter so controversial or confusing as to cause prejudice to Defendants.

### B. Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6)

### i. Count I - PVSD Defendants

In Count I, Ruder alleges violations of his civil rights in contravention of 42 U.S.C. § 1983. Specifically, he alleges violations of his property and liberty interests; First Amendment rights; Fourteenth Amendment right to equal protection; and that he was a victim of a conspiracy.[4]

### a. First Amendment

The PVSD Defendants argue that Ruder's First Amendment claim should be dismissed because, while it is not entirely clear what speech Ruder is citing to, any speech described in Ruder's amended complaint is not the type protected by the First Amendment. (PVSD Defs.' Mem. 6.) Ruder responds that he was retaliated against in violation of the First Amendment for counseling a student, participating in a comedy website and for invoking his union protections. (Pl.'s Resp. PVSD Mem. 15-16.)

--------

[3] I note that the RGAL Defendants failed to file a brief in support of their motion to dismiss. Local Rule of the U.S. District Court of the Eastern District of Pennsylvania 7.1(c) requires that every motion not certified as uncontested be "accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion."

[4] In response to Count I, the PVSD Defendants argue that Ruder's First and Fourteenth Amendment claims should be dismissed. However, Ruder additionally pled claims under §1983 for violations of his property and liberty interests, and for conspiracy. (Pl.'s Resp. 12-13.) Because the PVSD Defendants failed to address these claims, they will survive.

To state a First Amendment retaliation claim, a public employee must allege: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. <u>DeLuzio v. Monroe County</u>, 271 Fed.Appx. 193, 196 (3d Cir. 2008). As to the first prong, the First Amendment protects a public employee's statement when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement made." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241–42 (3d Cir. 2006) (citing <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006)). Speech implicates matters of public concern when it involves social or political concerns of the community. <u>Gorum v. Sessoms</u>, 561 F.3d 179, 187 (3d Cir. 2009).

Ruder first alleges that Marin admonished and disciplined him for "counseling a student and exercising his rights of free speech over the internet in a comedy website that was unrelated to school and outside work hours," while other employees were not "disciplined and silenced" for publishing on facebook and emailing with students. (Pl.'s Resp. to PVSD Mem.15.)

After careful review of the amended complaint, I cannot determine whether this speech involved social or political concerns of the community, thus involving a matter of public concern. Further, because the activity is unclear, I cannot determine whether there was adequate justification for allegedly treating Ruder differently than other employees.

When a complaint does not contain allegations supporting each element of a plaintiff's claim, but "the deficiency is not so material that the pleading should be dismissed under Rule 12(b)(6), a more definite statement is appropriate . . . . [S]uch motions [are] preferable to dismissal under Rule

12(b)." <u>Lada v. Deleware County Community College</u>, 2009 WL 3217183, at * 6 (E.D.Pa. Sept. 30, 2009) (citing Moore's Federal Practice §§ 12.36[1], [6] (3d ed. 2007)). Even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, "a District Court must permit a curative amendment, unless an amendment would be inequitable or futile." <u>Alston v. Parker</u>, 363 F.3d 229, 235 (3d Cir. 2004) (citing <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002) (citing <u>Shane v. Fauver</u>, 213 F.3d 113, 116 (3d Cir. 2000)). "Futility" means that the "complaint, as amended, would fail to state a claim upon which relief could be granted." <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1434 (3d Cir.1997) (citing <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 623 (1st Cir.1996) (citing 3 Moore's Federal Practice ¶ 15.08[4], at 15-80 (2d ed.1993))). In assessing futility, the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). <u>Id.</u> (citing 3 Moore's at ¶ 15.08[4], at 15-81).[5]

As previously noted, I find that Ruder's claims of being disciplined for counseling a student and participating in a comedy club are too vague to determine whether they are protected by the First Amendment. However, "because the deficiency is not so material that the pleading should be dismissed under Rule 12(b)(6)," and because I do not find that amendment would be futile, Ruder is granted fourteen days to amend his complaint to reassert his § 1983 First Amendment Retaliation claim with more specificity. <u>See</u> <u>Lada</u>, 2009 WL 3217183 at * 6.

_____

[5] The Third Circuit has suggested that: "[D]istrict judges expressly state, where appropriate, that the plaintiff has leave to amend within a specified period of time, and that application for dismissal of the action may be made if a timely amendment is not forthcoming within that time. If the plaintiff does not desire to amend, he may file an appropriate notice with the district court asserting his intent to stand on the complaint, at which time an order to dismiss the action would be appropriate." <u>Shane</u>, 213 F.3d at 116 (quoting <u>Borelli v. City of Reading</u>, 532 F.2d 950, 951 n. 1 (3d cir. 1976)).

Ruder next argues that "speaking out" to invoke his union protections and assert a claim for employment benefits was protected speech under the First Amendment, specifically, the Petition Clause. (Pl.'s Resp. to PVSD Mem.15-16). (The Petition Clause of the First Amendment provides that there shall be "no law abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.).

Again, the Court must first determine whether the speech at issue was protected by the First Amendment. "Private grievances as an employee" and "speech related solely to mundane employment grievances" are not examples of speech constituting matters of public concern, and thus, are not protected by the First Amendment. <u>Lada</u>, 2009 WL 3217183 at * 4 (citing <u>Miller v. Clinton County</u>, 544 F.3d 542, 550 (3d Cir. 2008); <u>Sanguigni v. Pittsburgh Board of Public Education</u>, 968 F.2d 393, 399 (3d Cir.1992)). However, "a public employee who has petitioned the government through a formal mechanism [such as a lawsuit, grievance, or workers compensation claim] is protected under the Petition Clause from retaliation for that activity, even if the petition concerns a matter of solely private concern." <u>Id</u>. at * 5 (citing <u>Foraker v. Chaffinch</u>, 501 F.3d 231, 236 (3d Cir. 2007)). Internal "complaints up the chain of command," conversely, do not implicate the right to petition under the First Amendment. <u>Id</u>. Neither does seeking informal assistance from a union - including by letter, phone call, or meeting - implicate the right as a plaintiff's "meeting with union representatives [ ] is not in the nature of a formal grievance procedure that the Petition Clause is designed to protect." <u>Cooper v. Cape May County Board of Social Services</u>, 175 F.Supp.2d 732, 746 (D.N.J. 2001).

Ruder contends that he "repeatedly sought Union assistance" regarding sick leave benefits and "copied . . . moving defendants" on these requests as they refused to respond to his pleas for

information. Seeking informal assistance from the union, in whatever fashion it was done, would not implicate Ruder's right to petition. Ruder also claims he "formally invoked" his union protections after Defendants suspended him for his ill health on February 5, 2009, and then disciplined him for not attending a disciplinary meeting the following day - February 6, 2009. (Pl.'s Resp. to PVSD Mem. 16.) However, because I have no information on how Ruder formally invoked union assistance, I find that his claim is too vague for the Court to determine whether his actions implicated a right to protection under the First Amendment.[6] Because I do not find that amendment would be futile, Ruder is granted fourteen days to amend his complaint to more definitively state his claim.

### b. Fourteenth Amendment

The PVSD Defendants next argue Ruder's Fourteenth Amendment Equal Protection claim should be dismissed because he did not identify how he was denied equal protection of the law. (PVSD Defs.' Mem. 6-7.)

The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by other individuals similarly situated." Warenecki v. City of Philadelphia, 2010 WL

---

[6] I note that Ruder filed charges of discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission, (Am. Compl. ¶ 74), and in response to his charges, Ruder received a right to sue letter from the United States Department of Justice dated October 30, 2009. (Am. Compl. Ex. O.) However, Ruder has not informed the Court when he filed his charges with the EEOC.

4344558 (E.D.Pa. 2010) (citing Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 196 (3d Cir. 2009) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)).

Ruder bases his equal protection claim on his status as a disabled individual. (Am. Compl. ¶ 27.) The Supreme Court has held that the disabled are not a suspect class for purposes of an equal protection challenge. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Thus, state action predicated upon an individual's physical disability does not give rise to a constitutional violation unless there is no rational basis for the action, meaning that "there is no rational relationship between the disparity of treatment and some legitimate governmental purpose." Abrams v. Port Authority Trans-Hudson Corp., 2010 WL 1265190 at * 5 (D.N.J. March 26, 2010) (citing Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 377 (2000)). "Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Id.

Ruder did not specify how he was denied equal protection of the law. His response to the motion to dismiss merely states that his "claims of discrimination and disparate treatment because of his disability invoke [his] protections under the Equal Protection C[l]ause of the Fourteenth Amendment for which the complaint sufficiently pleads claims." (Pl.'s Resp. to PVSD Mem. 16.)

Looking to the amended complaint in a light most favorable to Ruder, I find alleged "disparate treatment" on two occasions. First, Ruder alleges that was the only teacher directed to personally inform the principal or assistant principal when he expected to be late or leave work early. (Am. Compl. ¶ 39.) In order for this claim to rise to the level of an Equal Protection claim, Ruder

must demonstrate that he received different treatment from those "similarly situated" and that "there is no rational relationship between the disparity of treatment and some legitimate governmental purpose." Ruder has failed to do so.

Ruder also claims he was treated differently than Marin and Bowden in that he was disciplined for counseling a student and for his activity on a comedy website, while Marin and Bowden were not disciplined for having facebook accounts. As I do not know what Ruder advised the student or what the comedy website addressed, I cannot determine whether his behavior was analogous to that of Marin and Bowden, and thus, whether Ruder, Marin and Bowden were "similarly situated," nor can I determine whether there was a legitimate reason for the alleged disparity of treatment. Thus, I will grant Ruder fourteen days to amend his complaint to allege with more specificity how he believes he was denied equal protection.

ii. Counts II and IV - PVSD Defendants

The PVSD Defendants argue that Count II, which alleges that the PVSD Defendants violated the Americans with Disability Act (ADA), and Count IV, which alleges that the PVSD Defendants violated the Pennsylvania Human Relations Act (PHRA), should be dismissed because Ruder does not adequately allege that he has a disability under these statutes. (PVSD Defs.' Mem. 8-10.)

The United States Court of Appeals for the Third Circuit has held that digestion is a major life activity. Doe v. County of Centre, PA, 242 F.3d 437, 447 (3d Cir. 2001). More specifically, eliminating waste from the body is a major life activity, because in its absence, death results. Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 384 (3d Cir. 2004) (elimination of waste from the blood was a major life activity) (citing Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999)). Several district courts have found that Crohn's disease, which often results in difficulty controlling one's

bowels and eliminating waste, is a disability under the ADA. See Davis v. The Guardian Life Ins. Co., 2000 WL 1848596 (E.D.Pa. Dec.15, 2000); Wilder v. Southeastern Pub. Serv. Auth., 869 F.Supp. 409, 417 (E.D.Va.1994). Others have found that having Crohn's disease presents a triable issue of material fact as to whether a plaintiff has a substantial impairment in a major life activity. See, e.g., Duncan v. Quality Steel Prods., Inc., 2007 WL 2156289 (E.D.Mich. July 25, 2007); Banks v. CBOCS West, Inc., 2005 WL 1126913 (N.D.Ill. May 9, 2005).

I agree that having Crohn's disease presents a triable issue of material fact as to whether Ruder has a substantial impairment in a major life activity. Thus, Counts II and IV will survive.

### iii. Count III - Pequea Valley School District

In Count III of his amended complaint, Ruder alleges that Pequea Valley violated the Family Medical Leave Act (FMLA) by failing to convey medical information. (Am. Compl. ¶¶ 41(a), 43.)

The stated purposes of the FMLA are to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 140-41 (3d Cir. 2004) (citing 29 U.S.C. § 2601(b)(1) and (2)).

In order to protect the substantive rights created by the FMLA, the Act provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Additionally, the Department of Labor promulgated regulations implementing the FMLA, which provide that "[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. 825.220(b). Further, the regulations provide:

(1) When an employee requests FMLA leave, or when the employer acquires

> knowledge that an employee's leave may be for an FMLA-qualifying reason, the
> employer must notify the employee of the employee's eligibility to take FMLA
> leave within five business days, absent extenuating circumstances. See § 825.110
> for definition of an eligible employee. Employee eligibility is determined (and
> notice must be provided) at the commencement of the first instance of leave for
> each FMLA-qualifying reason in the applicable 12-month period . . . .

29 C.F.R. § 825.300(b) (emphasis added).

The FMLA regulations clearly impose a duty on an employer to advise eligible employees of their rights under the FMLA. Thus, an eligible employee can "show an interference with his right to leave under the FMLA, within the meaning of 29 U.S.C. § 2615(a)(1), if he is able to establish that this failure to advise rendered him unable to exercise that right in a meaningful way, thereby causing injury." Conoshenti, 364 F.3d at 141.

Ruder has pled sufficient facts to make a claim that he was entitled to a benefit, namely information about his eligibility to take FMLA leave under 29 C.F.R. § 825.300(b), and that Pequea Valley denied him that benefit by failing to advise him of his rights. Ruder has alleged that because he did not have the requested information, he attempted to go to school on February 5, 2009 when he was too sick to do so and his illness caused him to be "late for work and subsequently suspended and terminated from employment." I find that this claim adequately sets forth that the alleged failure to advise Ruder of his rights under the FMLA may have rendered him unable to exercise his rights, thereby causing him injury. Thus, this claim survives Defendants' motion to dismiss.

iv. Count V - PVSD Defendants & RGAL Defendants

In Count V, Ruder avers that the individual PVSD Defendants and RGAL Defendants wrongfully interfered with his contractual relations. (Am. Compl. ¶¶ 100-02.)

Under Pennsylvania law, "[o]ne who intentionally and improperly interferes with the

performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract." Wagner v. Tuscarora School Dist., 2006 WL 167731, at * 13 (M.D.Pa. Jan. 20, 2006) (citing Judge Tech. Servs., Inc. v. Clancy, 813 A.2d 879, 887 (Pa.Super.Ct. 2002)). In order to prove a claim for intentional interference with a contractual relationship, a plaintiff must demonstrate: (1) the existence of a contractual relationship; (2) the defendant's intent to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege for such interference; and (4) damages resulting from the defendant's actions. Id. (citing Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir.1998); Triffin v. Janssen, 426 Pa.Super. 57, 626 A.2d 571, 574 (Pa.Super.Ct.1993)).

A right of recovery under the theory of tortious interference only exists if there is a contractual relationship between the plaintiff and a party other than the defendants. Wagner, 2006 WL 167731, at * 13 (citing Killian v. McCulloch, 850 F.Supp. 1239, 1251 (E.D.Pa.1994); Nix v. Temple University, 408 Pa.Super. 369, 596 A.2d 1132, 1137 (Pa.Super.Ct. 1991)). Thus, under Pennsylvania law, a corporation cannot tortiously interfere with a contract to which it is a party. Id. (citing Nix, 596 A.2d at 1137). Further, since a corporation acts through its agents and officers, such agents and officers cannot be considered third parties when they are acting in their official capacities. Id. Likewise, in a school setting where the contract at issue is an employment contract, a school district employee cannot make a tortious interference with contractual relations claim against a school district's employees, agents, or members of the School Board, because, when acting in their official capacity, they are not "third parties." See Forrest v. Owen J. Roberts School Dist., 2011 WL 1196410 (E.D.Pa. March 31, 2011).

16

However, a school district employee or agent can be considered a third party liable for inducing a breach of contract if the individual's "*sole* motive in causing the corporation to breach the contract is actual malice toward the plaintiff, or if the officer's conduct is against the corporation's interest." Wagner, 2006 WL 167731, at * 13 (citing Killian, 850 F.Supp. at 1252 (emphasis in original) (citing Avins, 610 F.Supp. at 318)).

### The PVSD Defendants

The PVSD Defendants argue Ruder's claim fails because the amended complaint makes no mention of the existence of a third party contract, how they interfered with a third party contract, or how Ruder was damaged by the Defendants' actions. (PVSD Defs.' Mem. 14.) Ruder's sole response is that he has pled sufficient details to satisfy the notice pleading that the individual defendants interfered with his contract of employment with the Pequea Valley School District. (Pl.'s Resp. to PVSD Mem. 21.)

I agree with the PVSD Defendants that there is no third party contract. Each of the PVSD Defendants is a Pequea Valley employee, agent, or member of the School Board. Because a careful reading of the amended complaint reveals that all of Ruder's allegations of misconduct occurred within the scope of his employment, the PVSD Defendants are not third parties under tortious interference law. Thus, Ruder's claim can only proceed if he has sufficiently alleged that the PVSD Defendants acted with actual malice or against the District's interest.

Ruder has alleged that the "named Defendants" acted "maliciously" to interfere with his contract. In support of these allegations, he claims that on numerous occasions, he requested accommodations for his medical condition and information on medical leave from Marin, Bowden and Hallock, yet received no accommodations or information. Ruder further claims that "[w]ithout

the requested leave information, the incapacitated and disoriented plaintiff attempted to appear at work on February 5, 2009, only to be unable to complete the travel without tending to a flare-up of diarrhea and nausea that caused the plaintiff to be late for work and subsequently suspended and terminated from employment."  Ruder was hospitalized that same day.  (Pl.'s Resp. to PVSD 19.) Ruder also contends that he was then wrongfully accused of intentionally violating the attendance policy on February 5, 2009 and insubordination in failing to appear for a disciplinary meeting on February 6, 2009, when the Defendants knew he was in Hershey Medical Center.  (Am. Compl. ¶ 58.)  Ruder alleges these false statements were published without investigation into the truth and that the Board terminated his employment based on these allegations, again without investigation.

Taking such allegations as true, as I am bound to do at this juncture of the litigation, Ruder has adequately alleged that the PVSD Defendants acted with actual malice.  Thus, despite being agents and employees of the District, he has sufficiently pled that their actions interfered with his contract.

### The RGAL Defendants

The RGAL Defendants claim Count V should be dismissed as Ruder has failed to satisfy the second element of an intentional interference with contracts claim - that  there was an intent to harm by interfering with a contractual relationship.  They contend that Ruder has not articulated any evidence to show that Gephart's actions in verifying information were specifically intended to interfere with his contract with Pequea Valley.  Rather, they contend, Ruder  merely speculates that Gephart's actions in verifying information resulted in his dismissal from his position with Pequea Valley.  (RGAL Defs.' Mot.  ¶¶ 42-43.)

"[O]ne interferes with a contract only where he causes a party not to perform under it."

DiGiorgio Corp. v. Mendez and Co., Inc., 230 F.Supp.2d 552, 566 (D.N.J.2002). In determining whether there was an intent to harm by interfering with a contractual relationship, the focus is on whether a defendant's conduct was "proper under the circumstances." Brooks v. System Mfg. Inc., 2006 WL 560153, at * 4 (E.D.Pa. March 6, 2006) (citing Alder, Barish, Daniels, Levin and Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1184 (Pa.1978)). To determine whether the conduct was proper, a court should consider: "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the proximity or remoteness of the actor's conduct to the interference; and (e) the relations between the parties." Id.

Here, it is alleged that Gephart responded to a request for information regarding a return to work form that an employer had received from a RGAL patient. While Gephart's motive is not articulated, there is no evidence that she responded to the email request for any reason other than to answer the question posed to her. Moreover, Ruder has not alleged that Gephart or any of the RGAL Defendants were aware that a contract existed between Ruder and or, if they were aware of it, that they had any interest in that contract. Nor is there any allegation that Gephart had ever spoken with anyone at Pequea Valley prior to receiving an email from Bowden. Even if it was improper for Gephart to provide Bowden with information about the return to work form, nothing supports the allegation that the wrong was committed with an intent to harm Ruder's contractual relationship with the Pequea Valley. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'" Iqbal, 129 S.Ct. at 1949. Ruder has simply stated that "the RGAL Defendants, individually and jointly, interfered with the Plaintiff's contract of employment" and that "[i]ssues of fact credibility and intent are matters to explore through discovery." (Pl.'s Resp to RGAL Mem.

10.)    Ruder's allegations do not permit the Court to infer more than the mere possibility of misconduct.  Count V is dismissed as to the RGAL Defendants.

     v.    Count VI - PVSD Defendants & RGAL Defendants

In Count VI, Ruder alleges intentional infliction of emotional distress (IIED) against the individual PVSD Defendants and the RGAL Defendants.

To make an IIED claim, a plaintiff must allege the following elements: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused emotional distress; and (4) the resultant emotional distress was severe.  E.N. v. Susquehanna Tp. School Dist., 2010 WL 4853700, at * 19 (M.D.Pa. Nov. 23, 2010) (citing Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000)).[7]

"The gravamen of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor." Id. (citing Kazatsky v. King David Mem'l Park, Inc., 515 Pa. 183, 527 A.2d 988, 991 (Pa.1987)).  "It is for the court to determine in the first instance whether the element of outrageousness has been met." Id. (citing Swisher v. Pitz, 868 A.2d 1228, 1231 (Pa.Super.Ct. 2005)).  Alleged misconduct must be so extreme "as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized society . . . the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Strickland v. University of Scranton, 700 A.2d 979, 987 (Pa.Super.Ct.1997) (citations and quotations omitted).  A failure to act, or the negligence of a party

---

[7] The Pennsylvania Supreme Court has not formally adopted the tort of IIED.  However, the court has indicated that if it were to recognize such a cause of action, a plaintiff would have to plead and prove these elements. E.N., 2010 WL 4853700, at * 19 (citing Taylor, 754 A.2d at 652 (citing Restatement (Second) of Torts § 46 (Outrageous Conduct Causing Severe Emotional Distress)).

is insufficient to establish a claim for IIED.  Jackson v. Sun Oil Co., 361 Pa.Super. 54, 521 A.2d 469, 471 (Pa.Super.Ct.1987).

The Third Circuit Court of Appeals has held that it is "extremely rare" in the employment context for conduct to rise to the level of outrageousness necessary to support recovery for IIED. Mascarini v. Quality Employment Services & Training, 2011 WL 332425, at ** 9-10 (M.D.Pa. Jan. 31, 2011) (citing Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir.1988) (citing Rinehimer v. Luzerne Cnty. Cmty. Coll., 372 Pa.Super. 480, 539 A.2d 1298, 1305 (Pa.Super.Ct.1988)).  Even at the motion to dismiss stage, where the facts must be viewed in a light most favorable to plaintiff, "while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot provide for a basis for recovery for IIED." McComb v. Morgan Stanley & Co., Inc., 2007 WL 4150786, at * 8 (W.D.Pa. Nov. 19, 2007) (citing Capresecco v. Jenkintown Borough, 261 F.Supp.2d 319, 323 (3d Cir. 2003)).  Pennsylvania courts have permitted claims of IIED to proceed in the employment context in situations such as "where an employer engages in both sexual harassment and other retaliatory behavior." Mascarini, 2011 WL 332425 at ** 9-10, (citing Cox, 861 F.2d at 395).[8]

The PVSD Defendants

Ruder has alleged, without distinguishing amongst the Defendants, that his injuries arise from the "willful misconduct" of the individual PVSD Defendants.  He contends that "Defendants

_____

[8] In Mascarini, 2011 WL 332425. ** 9-10, two plaintiffs alleged "extreme harassment." Defendant threatened and harassed one plaintiff on a daily basis, referring to her by inappropriate and derogatory names, throwing tools at her and pounding on her desk, with the behavior culminating in a near physical altercation in which defendant allegedly lunged at her, raised his hand and stated "I outta back-hand you off the fuckin dock."  The second plaintiff alleged racial and sexual harassment in addition to purportedly false allegations of abuse lodged against her. The court found plaintiffs' allegations were sufficient to survive the motion to dismiss.

purposefully and recklessly failed to provide [him] medical leave and benefits that would have provided the plaintiff with the financial means and leave time to recuperate and maintain his employment and stature in the community." (Pl.'s Mem. 21-24.) Even if true, the PVSD Defendants failure to provide information, and Ruder's ultimate termination, do not rise to the level of "outrageous" conduct as required to state a claim for IIED against the PVSD Defendants. Thus the IIED claim is dismissed.

### The RGAL Defendants

According to the RGAL Defendants, even if Gephart's conduct in responding to Bowden's request for information contributed to Ruder's dismissal from his position as an art teacher, the conduct cannot be considered "extreme or outrageous." (RGAL Defs.' Mot. ¶¶ 50-53.)

Ruder responds that the RGAL Defendants' conduct in disclosing his status as a patient was "outrageous, exceedingly reckless, utterly insensitive and intolerable." In support of his claim, Ruder cites to the determination made by the Office of Civil Rights (OCR), after Ruder lodged a complaint against RGAL, finding that the RGAL Defendants violated Ruder's statutory rights and protections under the Health Insurance Portability and Accountability Act (HIPAA). (Pl.'s Resp. RGAL Mem. 11-12.)[9] Ruder further avers that the RGAL Defendants' conduct towards him

---

[9] The OCR letter states: "the complainant . . . alleges that an employee of RGAL impermissibly disclosed [Ruder's] protected health information when the employee verified that a note which Mr. Ruder presented to his employer was not in their records and additionally, not in their format." Further, "[w]hen Mr. Bowden inquired as to whether the patient had an appointment on a particular date, Ms. Gephart requested that he submit a signed Authorization from Mr. Ruder for the release of any additional information." OCR found that "[u]nder the Privacy Rule [45 C.F.R. Parts 160 and 164, Subparts A and E] a covered entity must obtain a valid authorization to release protected information to a third party unless otherwise permitted by the Rule. A covered entity may not verify the authenticity of a note presented by an employee to that employer as documentation of the employee's receipt of health care unless the covered entity receives the employee's valid authorization for disclosure in accordance with

breached the expected and published Patient's Bill of Rights.

While Gephart may have breached Ruder's privacy rights under the Patient's Bill of Rights and/or HIPAA, I do not find that this conduct rises to the level of extreme and outrageous. This count will also be dismissed as to the RGAL Defendants.

### vi. Count VIII - PVSD Defendants & RGAL Defendants

In Count VIII, Ruder alleges defamation against the PVSD and RGAL Defendants. In order to sustain a defamation claim under Pennsylvania law, a plaintiff must show:

> (1) The defamatory character of the communication[;] (2) Its publication by the defendant[;] (3) Its application to the plaintiff[;] (4) The understanding by the recipient of its defamatory meaning[;] (5) The understanding by the recipient of it as intended to be applied to the plaintiff[;] (6) Special harm resulting to the plaintiff from its publication[; and] (7) Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. Ann. § 8343. Additionally, Pennsylvania law requires that a plaintiff "demonstrate that the statement results from fault, amounting at least to negligence, on the part of the defendant." Allied Med. Assocs. v. State Farm Mut. Auto. Ins. Co., 2008 WL 4771850, at * 3 (E.D.Pa. Oct 30, 2008) (citing U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 923 (3d Cir.1990)).

"It is for the court to determine, in the first instance, whether the statement of which the plaintiff complained is capable of a defamatory meaning; if the court decides that it is capable of a defamatory meaning, then it is for the jury to decide if the statement was so understood by the reader

---

45 C.F.R. § 164.508." There was no indication RGAL had received such authorization from Ruder, thus "the practice disclosed the employee's status as a patient when it responded to the authenticity of the note submitted and further noted that it was not in the records." Gephart was educated with regards to the requirements of HIPAA as they pertained to the facts of the case and the case was closed. (Pl.'s Exhibit D, Correspondence from Office of Civil Rights, March 10, 2010.)

or listener." Id. To ascertain this meaning, the court "must view the statements in context." Id. (citing Tucker v. Phila. Daily News, 848 A.2d 113, 124 (Pa. 2004) (citing Thomas Merton Ctr. v. Rockwell Int'l Corp., 497 Pa. 460, 442 A.2d 213, 215-16 (Pa.1981))). Generally speaking "[a] communication is considered defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Mascarini v. Quality Employment Services & Training, 2011 WL 332425 at ** 9-10, (M.D.Pa. Jan. 31, 2011) (citing Purcell v. Ewing, 560 F.Supp.2d 337, 341 (M.D.Pa. 2008) (quoting Goralski v. Pizzimenti, 115 Pa.Cmwlth. 210, 540 A.2d 595, 597-98 (Pa.Commw.Ct.1988))). Courts applying Pennsylvania law have determined that a defamation claim may exist "where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." Mzamane v. Winfrey, 693 F.Supp.2d 442, 477 (E.D.Pa. 2010) (citing Thomas Merton, 442 A.2d at 217; Bogash v. Elkins, 405 Pa. 437, 176 A.2d 677, 679 (1962); Sarkees v. Warner-W. Corp., 349 Pa. 365, 37 A.2d 544, 546 (1944)).

"Pennsylvania courts have shown a willingness to interpret relatively mild statements as being capable of a defamatory meaning." Allied, 2008 WL 4771850, at * 3 n. 2 (citing Cosgrove Studio & Camera Shop v. Pane, 408 Pa. 314, 182 A.2d 751, 753-54 (Pa.1962) (holding that advertisement was capable of defamatory meaning because it implied that a competitor was engaged in bad business practices); Birl v. Phila. Elec. Co., 402 Pa. 297, 167 A.2d 472, 475-76 (Pa.1960) (holding statement that ex-employee quit "without notice" was capable of defamatory meaning because recipients could conclude that ex-employee "lacked honor and integrity and was not a person to be relied upon insofar as his business dealings were concerned")).

Although the Court has not been provided with information about where the allegedly defamatory statements were published, neither the PVSD or the RGAL Defendants contest that the publication element is present; nor have they alleged a privilege. Thus, viewing the allegations in a light most favorable to Ruder, the Court can "distill" its analysis to: "(1) whether the statements are capable of defamatory meaning under Pennsylvania law; (2) whether the statements are 'of or concerning' Plaintiff," Mzamane, 693 F.Supp.2d at 478; and (3) whether Ruder has demonstrated that the statement resulted from "fault, amounting at least to negligence, on the part of the defendant." Allied, 2008 WL 4771850, at * 3.

The PVSD Defendants

The PVSD Defendants claim that "Plaintiff makes absolutely no allegation that [the recipients of the defamatory statement] understood the communication about the Plaintiff to be defamatory" or how a termination letter injured him, as opposed to having been injured by the termination. (PVSD Defs.' Mem. 19-20.)

As set forth above, the Court need only determine whether the PVSD Defendants' statements are capable of a defamatory meaning. It is then for a jury to decide if the statement would be understood to be defamatory by the reader or listener. Ruder alleges that the PVSD Defendants published a communication stating a variety of falsehoods including that he forged the March 18, 2009 RGAL medical statement. (Am. Compl. ¶ 58.)[10] I find that an allegation of forgery could harm

_____

[10] Additionally, according to Ruder, the PVSD Defendants published falsehoods and misstatements that wrongfully accused him of the following: intentionally violating the attendance policy on February 5, 2009; insubordination in failing to appear for a disciplinary meeting on February 6, 2009, knowing Ruder was in Hershey Medical Center; failing to provide documentation of his disability to support leave from work; improperly taking cash from students, promising to purchase art supplies; taking $60.00 from a student and never buying the supplies. (Am. Compl. ¶ 58.)

Ruder's reputation as an honest employee and thus is capable of defamatory meaning. Further, the statements were clearly "of or concerning" Ruder.

As for whether the publication resulted from fault "amounting to at least negligence," I find Ruder has sufficiently pled that the PVSD Defendants failed to investigate the truth of the claims they published.

The PVSD Defendants further posit that even if Ruder sufficiently alleged defamation, Count VIII should be dismissed because they are immune from liability under the Pennsylvania Political Subdivisions Tort Claims Act (PPSTCA).[11]

The PPSTCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. § 8541. Employees of local agencies, including Pequea Valley employees, are also generally immune from liability under the PPSTCA for acts committed within the scope of their employment. 42 Pa. Cons. Stat. § 8545 ("An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency"). Pennsylvania courts have specifically held that municipalities and their employees are immune from claims for defamation. See Alston v. PW - Philadelphia Weekly, 980 A.2d 215, 219 (Pa.Cmwlth. 2009). However, employees do not have immunity when their acts constitute "a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550.

Willful misconduct has been defined as "conduct whereby the actor desired to bring about

_____

[11] The PVSD Defendants also make this argument as to Count VI - IIED. Because I dismissed Count VI for failure to state a claim, immunity was not addressed.

the result that followed or at least was aware that it was substantially certain to follow." E.N., 2010 WL 4853700, * 19 (citing Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) (quoting Renk v. City of Pittsburgh, 537 Pa. 68, 641 A.2d 289, 293 (Pa.1994))). Willful misconduct is essentially "synonymous with the term 'intentional tort,'" and is a demanding level of fault. Id. The existence of willful misconduct is a question of law. Id. (citing Kuzel v. Krause, 658 A.2d 856, 860 (Pa.Commw.Ct.1995)).

Viewing the facts in a light most favorable to Ruder, he contends that the PVSD Defendants published the allegedly defamatory statements either without investigation or, in the instance of the allegation of insubordination in failing to appear for a disciplinary meeting on February 6, 2009, Ruder alleges that the PVSD Defendants knew that he was in Hershey Medical Center on that date. While I do not find that a failure to investigate would rise to the level of willful misconduct, I do find that if the PVSD Defendants published a statement knowing that it was inaccurate (e.g., accusing Ruder of insubordination for failing to attend a meeting knowing that he was in the hospital), it could be found that they acted with the understanding that the publication would almost certainly result in Ruder's termination from employment. Such conduct could be found to rise to the level of willful misconduct. Thus immunity under the PPSTCA does not apply.

Alternatively, the PVSD Defendants argue that Defendant Superintendent Patrick Hallock, and Defendant School Board Members Ferris, Blackbill, Rohrer, Hershy, Hertzlerm, Rank, Sage, Sensing, and Wright should be dismissed pursuant to the Doctrine of High Public Official Immunity. (PVSD Defs.'s Mem. 15-16.)

The Supreme Court of Pennsylvania has held that high public official immunity is an unlimited privilege that exempts high public officials from lawsuits for defamation, provided the

statements made by the official are made in the course of his official duties and within the scope of his authority.  Smith, 112 F.Supp.2d at 225 (citing Lindner, 677 A.2d 1194).  "Although ordinary local agency employees can be held liable if they have engaged in crime, actual fraud, actual malice or willful misconduct . . . high public officials accused of defamation enjoy absolute immunity even when willful misconduct is alleged."  Id.  (citing 42 Pa.C.S.A. § 8550; Mascaro v. Youth Study Center, 514 Pa. 351, 523 A.2d 1118 (1987); Lindner, 677 A.2d 1194; Kuzel v. Krause, 658 A.2d 856 (Pa.Cmwlth.1995)).

Pennsylvania common law recognizes the doctrine of absolute immunity for "high public officials." Smith v. School Dist. of Philadelphia, 112 F.Supp.2d 417, 425 (E.D.Pa. 2000) (citing Lindner v. Mollan, 677 A.2d 1194, 1195-96 (1996) (holding that the Tort Claims Act does not abrogate high public official's absolute immunity from civil suits arising out of false defamatory statements)). Moreover, Pennsylvania courts have recognized that school superintendents . . . and presidents of school boards . . . qualify as high public officials for purposes of this common law doctrine. Id. (citing Petula v. Mellody, 631 A.2d 762 (Pa.Cmwlth.1993); Matta v. Burton, 721 A.2d 1164, 1166 (Pa.Cmwlth.1998)).

Ruder's averments are limited to activities either taken at official school district  meetings or outside of meetings in apparent connection with school district business.  A careful reading of the complaint reveals that Plaintiff has not alleged injurious conduct occurring outside of these official settings.

Thus, I find that Defendants Patrick Hallock, the Superintendent of the Pequea Valley School District, and Defendant Brian Ferris, the President of the Pequea Valley School Board, qualify for immunity under this doctrine.  The doctrine does not apply to the remaining members of the School

Board.

<u>The RGAL Defendants</u>

According to Ruder, the RGAL Defendants defamed him by publishing false statements to Bowden that accused Ruder of forging a medical note. He claims that the PVSD Defendants then relied on the false accusations as a basis for suspending and terminating Ruder's employment. (Pl.'s Mem. 12-13.)

The RGAL Defendants respond that Gephart's statement to Bowden that "we do not have [the return to work form] in our records - it is not our format" does not amount to defamation. They argue truth is an absolute defense to defamation claims and "[t]here have been absolutely no allegations that the substance of Defendant Gephart's statement was untrue." The RGAL Defendants also argue that a statement is deemed to be defamatory "if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession" and the communication between Gephart and Bowman "clearly was not defamatory, as her statement does not directly relate to the Ruder, his character, his condition or his actions." (Def.'s Mot. ¶¶ 70-71.)

I first note that Ruder has alleged that the communication by Gephart was untrue in that RGAL did not have a set format for its return to work medical statements. Ruder also alleges that the fact that the note was not in Ruder's record was due to RGAL's deficient record keeping. With respect to whether the statement is capable of defamatory meaning, I find that Ruder has sufficiently pled that even if the words utilized themselves were not defamatory in nature, the context in which they were issued could create a defamatory implication that Ruder had forged the return to work statement. It could also be found that Gephart acted negligently in reporting that the return to work

form was not in RGAL format if, in fact, RGAL did not use a set format. They could also be found negligent if the letter was not in Ruder's file because RGAL misplaced it. Consequently, this claim will proceed.

      vii. <u>Count VII - RGAL Defendants</u>

In Count VII, Ruder alleges that the RGAL Defendants breached their duty of care to protect his confidentiality and safeguard his medical records and information, and breached their published Patient Bill of Rights. Further, Ruder alleges the RGAL Defendants failed to comply with statutory law pursuant to HIPAA and Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R Parts 160 and 164, Subparts A, C, and E. Ruder claims this conduct amounts to negligence per se. (Am. Compl. ¶¶ 111-113.)

Under the doctrine of negligence per se, a violation of a statute or regulation may be grounds for finding that a defendant is per se liable. <u>Mest v. Cabot Corp.</u>, 449 F.3d 502, 518 (3d Cir. 2006). To assert a claim for negligence per se, the plaintiff must demonstrate that: "1) the statute or regulation clearly applies to the conduct of the defendant; 2) the defendant violated the statute or regulation; 3) the violation of the statute proximately caused the plaintiff's injuries; and 4) the statute's purpose is, at least in part, to protect the interest of the plaintiff individually, as opposed to the public." <u>Id</u>. (citing <u>Wagner v. Anzon, Inc.</u>, 453 Pa.Super. 619, 684 A.2d 570, 574 (1996)). Negligence per se can not be found based on a plaintiff's allegation that a defendant has breached its own policy. <u>Hower v. Wal-Mart Stores, Inc.</u>, 2009 WL 1688474, at * 6 (E.D.Pa. June 16, 2009) (citing <u>Myers v. United States</u>, 17 F.3d 890, 900 n. 12 (6th Cir.1994) (noting that "one cannot be presumed negligent at law simply for violating one's own rules") (citation omitted)).

Thus, Ruder can bring a negligence per se claim based upon violation of a statute or

regulation,[12] but not based upon the RGAL Defendants' alleged breach of their own policies.

HIPAA's purpose is "to improve portability and continuity of health insurance coverage in the group and individual markets, to combat waste, fraud, and abuse in health insurance and health care delivery, to promote the use of medical savings accounts, to improve access to long-term care services and coverage, to simplify the administration of health insurance, and for other purposes." HIPAA, Pub.L. No. 104-191, 110 Stat.1936l; U.S. v. Jones, 471 F.3d 478 (3d Cir. 2006). The statute authorizes the Secretary of Health and Human Services to "adopt standards" that will "enable health information to be exchanged electronically, . . . consistent with the goals of improving the operation of the health care system and reducing administrative costs," and that will "ensure the integrity and confidentiality of [individuals' health] information [and protect against] . . . unauthorized uses or disclosures of the information." 42 U.S.C. § 1320d-2.

The Act makes clear that its purpose is to improve the operation of the health care system and reduce administrative costs. I thus find that even assuming that the HIPAA regulations cited to by Ruder apply to the RGAL Defendants and that the RGAL Defendants violated the regulations, the statute's purpose is to protect the interest of the general public, not any one specific group of individuals. See Mest, 449 F.3d at 518 (finding the Pennsylvania Air Pollution Control Act, which states that it is intended to protect the "public health, safety and well-being [of Pennsylvania] citizens," 35 Pa. Stat. Ann. § 4002(a), is an environmental statute governing air quality with the purpose of protecting the general public rather than the plaintiffs in particular); Marcesca v. Mancall,

_____

[12] Ruder also alleges violation of "Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R Parts 160 and 164, Subparts A, C, and E." 45 C.F.R. 160.101 "Statutory basis and purpose" states, in relevant part that the requirements of the subchapter implement portions of the Social Security Act as provided for under HIPAA.

2003 WL 21652170, at * 5 (E.D.Pa. June 29, 2003) (dismissing a negligence per se claim finding the purpose of the Health Care Facilities Act - which requires that, by way of example, an adequate medical record be maintained for every patient and that the record be complete, readily accessible and available, and include the findings and results of any tests and treatment - is to protect the interests of the public generally, and not to protect the interests of any particular group of individuals); compare with McCain v. Beverly Health and Rehabilitation Services, 2002 WK 1565526, at * 1 (E.D.Pa. 2002) (finding a negligence per se claim would not be dismissed because the Omnibus Budget Reconciliation Act (OBRA), the regulations enacting OBRA, and the Older Adult Protective Services Act were intended to protect "older persons" and not merely the public in general). This claim is also dismissed.

    viii.   Count IX - RGAL Defendants

Ruder also alleges that the RGAL Defendants intruded upon his "right to solitude or seclusion of his private and personal affairs." (Am. Compl. ¶ 135.)

The tort of intrusion upon seclusion is defined as: "intentionally intrud[ing], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts sec. 652B.[13] To prevail on this claim, a plaintiff must allege sufficient factual matter to show that (1) there was an intentional intrusion; (2) upon his solitude or seclusion, or his private affairs or concerns; and (3) that the intrusion was substantial; and (4) highly offensive. Truong v. Dart

---

[13] The Pennsylvania Supreme Court has not officially adopted the definition of intrusion upon seclusion as set forth in the Restatement (Second) of Torts; however, it has relied upon Section 652B of the Restatement in analyzing such claims. Truong v. Dart Container Corp., 2010 WL 4611980 at * 7 (E.D.Pa. Nov. 12, 2010) (citing Tagouma v. Investigative Consultant Services, Inc., et al., 2010 PA Super 147 (Pa.Super. August 10, 2010)).

Container Corp., 2010 WL 4611980, at * 7 (E.D.Pa. Nov. 12, 2010) (citing Clegg v. Falcon Plastics, Inc., 174 Fed.Appx. 18, 28 (3d Cir. 2006) (citing Larsen v. Philadelphia Newspapers, Inc., 375 Pa.Super. 66, 543 A.2d 1181, 1186-1187 (Pa.Super.1988)).  The invasion may be by physical intrusion into a place where the plaintiff has secluded herself, by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or by some other form of investigation or examination into the plaintiff's private concerns. See Comment "b" to § 652B.[14]  The Third Circuit Court of Appeals has concluded "that an actor commits an intentional intrusion only if he believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act.  We emphasize that the intrusion, as well as the action, must be intentional." O'Donnell v. U.S., 891 F.2d 1079, 1083 (3d Cir. 1989) (finding that the Veterans Administration (VA) did not invade a former patient's right to privacy under "intrusion upon seclusion theory" when it released psychiatric treatment summary to patient's employer without authorization, where the VA believed that it had permission to release the disputed record).

Ruder alleges that the RGAL Defendants violated his privacy rights and protections under HIPAA, a matter confirmed by OCR, by providing Bowden with information regarding the authenticity of the medical statement that Ruder had represented was from RGAL.  (Pl.'s Resp. RGAL Mem. 15.)  The RGAL Defendants argue the claim should fail as the disclosure of information was not highly offensive.

---

[14] Some examples of this tort include: a reporter taking a photograph of a person who refused to see him; a private detective who rents a room, looks into a plaintiff's bedroom windows through a telescope and takes pictures with a telescopic lens; a defendant who taps telephone wires and installs a recording device; use of a forged court order to examine bank records; and a professional photographer calling someone everyday for a month at inconvenient times to insist she come to his studio to be photographed. Soltz v. County of Lancaster, 2011 WL 815709 (E.D.Pa. 2011) (citing Restatement (Second) of Torts § 652B, Illustrations).

Even looking at the facts in a light most favorable to Ruder, he has not alleged that the RGAL Defendants made this disclosure believing that they lacked legal or personal permission to do so. The exchange between the parties proceeded as follows: Bowden requested that RGAL verify the authenticity of a return to work statement. Gephart responded by email that "we do not have [the return to work form] in our records - it is not our format." (PVSD Def.'s Mem. 20-21.) When Bowden then inquired as to whether the patient had an appointment on a particular date, Gephart responded "I can not verify more information without permission from the patient." (Pl.'s Ex. I, March 19, 2009 email from Gephart to Bowden.) Even assuming the disclosure was in violation of HIPAA, to commit an intentional intrusion, the defendant must "believe" or be "substantially certain" that he lacks the necessary legal or personal permission. There is no indication that Gephart acted with such knowledge.

Further, I do not find that an ordinary person would find it highly offensive that his medical provider disclosed that he was a patient, where the person discussed his illness with his employer on multiple occasions (Pl.'s Exs. A, D, E), specifically identified his medical provider, (Pl.'s Ex. E, Feb. 2, 2009 email from Ruder to Hallock, Marin, Bowden, Peter Akin and Ned Beck ("Ned on Friday I had an urgent appointment with Regional Gastroenterology Associates of Lancaster to determine what the next course of treatment was . . .")), and provided his employer with numerous medical statements from the medical provider. (Pl.'s Ex. J). This claim is will also be dismissed.

### ix. Count X (improperly pled IX) - Marin, Hallock, Bowden, Gephart, Rish

In order to prove a civil conspiracy, a plaintiff must show: (1) that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means; (2) an overt act taken in pursuit of a common conspiratorial purpose; and (3) actual legal

damages.  <u>Wagner v. Tuscarora School Dist.</u>, 2006 WL 167731 (M.D.Pa. 2006) (citing <u>Goldstein v. Phillip Morris</u>, 854 A.2d 585, 590 (Pa.Super.Ct. 2004)).  A claim of civil conspiracy cannot be pled without alleging an underlying tort.  <u>Id</u>. (citing <u>Boyanowski v. Capital Area Intermediate Unit</u>, 215 F.3d 396, 405-06 (3d Cir. 2000)).  Additionally, a plaintiff must prove malice on the part of the alleged conspirators.  <u>Id</u>.  (citing <u>Burnside v. Abbot Labs.</u>, 351 Pa.Super. 264, 505 A.2d 973, 980 (Pa.Super.Ct. 1985)).

Ruder argues that the individual PVSD and RGAL Defendants "acted in concert to publish false statements and accusations about the plaintiff that resulted in the plaintiff's involuntary termination from employment with Pequea Valley School District."   Ruder asserts discovery is ongoing and Defendants have yet to file their Answers to the Amended Complaint thus Defendants' request for dismissal is premature at this point.  (Am. Compl. ¶ 145; Pl.'s Mem. in Opp. PVSD 27; Pl.'s Mem. in Opp. RGAL 16.)

Defendants argue that the amended complaint does not contain any factual averment to support a claim of civil conspiracy.  There is no allegation that anyone from Pequea Valley had any prior communication or took any overt act with anyone from RGAL "to hatch an unlawful plan." (PVSD Def.'s Mem. 20-21; RGAL Defs.' Mem. 13-14.)

I agree with Defendants.  Ruder has not alleged any facts to support the possibility that Defendants acted in concert with the intent to do an unlawful act.  This claim will also be dismissed.

Our Order follows.